# EXHIBIT G

McCormick, Frank

Court of Appeal, Sixth Appellate District - No. H031028
**S149672**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re FRANK MCCORMICK on Habeas Corpus

---

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED
APR 11 2007
Frederick K. Ohlrich Clerk
Deputy

MORENO
Acting Chief Justice

Court of Appeal, Sixth Appellate District - No. H031028
**S149672**

# IN THE SUPREME COURT OF CALIFORNIA

---

In re FRANK MCCORMICK on Habeas Corpus

---

The time for granting or denying review in the above-entitled matter is hereby extended to and including April 24, 2007, or the date upon which review is either granted or denied.

SUPREME COURT
FILED

MAR 1 6 2007

Frederick K. Ohlrich Clerk

Deputy

Chief Justice

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| Frank McCormick<br><br>Petitioner,<br><br>v.<br><br>Ben Curry (Warden)<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.<br><br>Court of Appeal<br>Sixth Appellate<br>District No. H031028<br>(Monterey County<br>Super. Ct. No. HC5337) |

**PETITION FOR REVIEW**

After Decision by the Court of Appeal
Sixth Appellate District
Filed January 12, 2007

P.O. Box 689
Soledad, CA 93960-0689
Petitioner In Pro Se

# TABLE OF AUTHORITIES


| Cases | Page(s) |
|---|---|
| Biggs v. Terhune (9th. Cir. 2003) 334 F. 3d. 910 | 3-5 |
| In re Scott (2004) 119 Cal.App. 4th. 871 | 3-8 |
| In re Smith (2003) 114 Cal.App. 4th. 343 | 2 |
| In re Smith 109 Cal.App. 4th. 489 | 3 |
| Irons v. Warden of California State Prison-Solano (E.D.Cal. 2005) 358 F.Supp. 2d. 936 | 2-7 |
| Martin v. Marshall 431 F.Supp. 2d. | 2-6 |
| Robert Everett Johnson v. Claude E. Finn No. CIV S-05-0385 (January 19, 2006) | 2 |
| Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F.Supp. 2d.1063 | 2-5 |
| **STATUTES** | |
| Penal Code | |
| §3041 (b) | 5-8 |
| §5068 | 9 |
| Departmental Operations Manual | |
| 62090.13 | 9 |
| California Code of Regulations | |
| §2403 (b) | 1 |
| §2403(c) | 7 |
| California Constitution | |
| Article I, §15 | 3 |
| Article I, §7(a) | 3 |

TABLE OF CONTENT

PETITION FOR REVIEW 1

QUESTION PRESENTED 1

NECESSARY FOR REVIEW 2

ARGUMENT I

THE BOARD VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND DEPRIVED HIM OF A FEDERALLY PROTECTED LIBERTY INTEREST WHEN THEY ARBITRARILY AND CAPRICIOUSLY DENIED HIM PAROLE SUITABILITY WITHOUT ANY SUPPORTING EVIDENCE HAVING AN INDICIA OF RELIABILITY THAT PETITIONER'S RELEASE WOULD POSE AN UNREASONABLE RISK OF DANGER TO SOCIETY. 3

ARGUMENT II

THE BOARD OF PAROLE HEARINGS DENIED PETITIONER DUE PROCESS AND EQUAL PROTECTION OF THE LAW BECAUSE IT HAS DENIED PAROLE SUITABILITY BASED ON FACTORS OF THE CRIME WHICH ARE "IMMUTABLE". 7

CONCLUSION 11

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

Frank McCormick

Petitioner,

v.

Ben Curry (Warden)

Respondent.

No. ____________

Court of Appeal Sixth Appellate District No. H031028 (Monterey County Super. Ct. No. HC5337)

**PETITION FOR REVIEW**

TO THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA:

Petitioner Frank McCormick petition his court for review following the decision of the Court of Appeal, Sixth Appellate District, filed in that court on January 12, 2007. A copy of the denial is attached hereto as Exhibit "A".

QUESTION PRESENTED

1. Is the Board of Parole Hearings violating Petitioner's State and Federal Due Process Rights when parole suitability determinations are not supported by "some evidence" and was the "some evidence" standards correctly applied in this case?

2. Can the California Board of Parole Hearings continue to deny parole based on the commitment offense after Petitioner has served more than the maximum suggested Base Term established by California Code of Regulations, Division 2, Article 11, section 2403 (b)?

3. Did the Board of Parole Hearings Violate Petitioner's constitutional right to a protected liberty interest when they denied him parole suitability without evidence having an indicia of reliability that Petitioner's release would pose a present unreasonable risk of danger to society?

4. Did the Board of Parole Hearings deny Petitioner his Due Process and Equal Protection of the law by denying parole based on factors that are immutable?

**NECESSARY FOR REVIEW**

A grant of review and resolution of these issues by this court are necessary to secure uniformity of decisions and to settle important questions of law. The need for uniformity of decisions is demonstrated by a comparison of this case with Rosenkrantz v. Marshall, (C.D.Cal. 2006) 444 F.Supp 2d. 1063, 1065, 1070; Robert Everett Johnson v. Claude E. Finn, No. CIV S-05-0385 DFL GGH P (January 19, 2006); Martin v. Marshall, 431 F.Supp. 2d.; Irons v. Warden of California State Prison-Solano, (E.D.Cal. 2005) 358 F.Supp. 2d. 936. and other cases that were adjudicated by California state courts.

In In re Smith, (2003) 114 Cal.App. 4th. 343, the Sixth District Court of Appeal found that there was not some evidence that Petitioner Smith's crime was any more callous than an average second degree murder, yet the same court denied Petitioner's writ and the crime was not as callous as the crime Smith committed. There was nothing to "distinguish th[e] crime from other second degree murders." The Second District Court of Appeal, in the case of another

life term inmate named Smith, similarly found no evidence to support a parole denial based on the commitment offense. (In re Smith, 109 Cal.App. 4th. 489.) In In re Scott, (2004) 119 Cal.App. 4th. 871, the First District Court of Appeal reversed the parole Board's standard statement of reliance on the gravity of the offense because in truth, "the relevant evidence show[ed] no more callous disregard for human suffering than is shown by most second degree murder offenses."

Petitioner respectfully submit that viewing these cases together and then reviewing Petitioner's case, demonstrates the lack of uniformity in the application of the due process standards, and further demonstrates that the decision in the instant case conflicts with the recently announced Federal due process standards delineated in Biggs v. Terhune, supra., 914 916-917, because the decision was not supported by "some [post-conviction] evidence" satisfying the "indicia of reliability" guidelines promulgated therein, as required by the United States Constitution, Article I, section 15.

This case, while resting on state due process (Cal. Const., art. I, §7, subd. (a)), compares favorable to cases affording habeas corpus relief on federal due process grounds, against parole denials for California inmates who had been sentenced to terms of at least 15 years to life for second degree murder.

**ARGUMENT I**

**THE BOARD VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND DEPRIVED HIM OF A**

FEDERALLY PROTECTED LIBERTY INTEREST WHEN THEY ARBITRARILY AND CAPRICIOUSLY DENIED HIM PAROLE SUITABILITY WITHOUT ANY SUPPORTING EVIDENCE HAVING AN INDICIA OF RELIABILITY THAT PETITIONER'S RELEASE WOULD POSE AN UNREASONABLE RISK OF DANGER TO SOCIETY.

**A. INTRODUCTION**

On August 10, 1983, Seaside Police arrested Alfred Emanuel "Bubba" Johnson, Jr. and Petitioner as suspects in the shooting death of Stephen Edwards. Petitioner was charged and convicted of second degree murder and received a sentence of 15 years to Life plus two (2) years for a gun enhancement. Petitioner, now 54 years old, entered prison at the age of 32. Petitioner was received by the Department of Correction on December 22, 1983 with a MIN. ADJ. RELEASE DATE (GT CR LOST/AT LARGE/BAIL) of 5-14-93. (See Exhibit "B", LEGAL STATUS (CDC 188c)).

Petitioner's Initial Consideration Hearing was held on April 28, 1992. Petitioner has had twelve (12) subsequent hearings where he was found to be unsuitable for parole.

**B. THE BOARD OF PAROLE HEARINGS DECISION TO DENY PETITIONER PAROLE SUITABILITY WAS NOT SUPPORTED BY "SOME EVIDENCE" HAVING AN "INDICIA OF RELIABILITY."**

At Petitioner's hearing, held on 11-14-05, the Board denied Petitioner parole suitability for one (1) year stating; "The main factor, or one of the main factors, is the gravity of the offense, in that after reviewing the facts of this crime, it is the opinion of this Panel that 'the offense was carried out in a especially cruel and callous manner, in that the unarmed victim was shot at close

range at torso piercing his aorta resulting in his almost immediate demise, and that according to the autopsy, he died within minutes of having been shot." (See Exhibit "C", DECISION PAGE 1, LL. 14-24).

In Biggs v. Terhune, supra., at pp. 914, 916-917, the Court first held that because the "California parole scheme [Penal Code §3041(b)] vest in every inmate a constitutionally protected liberty interest" "protected by the procedural safegards of the Due Process Clause," "the evidence underlying [every California Parole] Board [parole denial] decision must have an indicia of reliability[,]" and then established parole decision standards for the Board to use when weighing evidence, holding that;

> "[While] the [California] parole board's sole supporting reliance on the gravity of [a first degree murder] offense [involving the killing of a witness] and conduct prior to imprisonment to justify denial of parole can initially be justified as fulfilling the requirements set forth by state law [,o]ver time, however, should [a Petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him parole simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty in parole."

In one case, the court found due process violation when the former Board of Prison Terms (BPT) denied parole, as it had before, based solely on the gravity of the commitment offense. (Rosenkrantz v. Marshall, (C.D.Cal. 2006) 444 F.Supp. 2d. 1063, 1065, 1070.) The court reasoned in pertinent part: "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on

such unchanging circumstances - after nearly two decades of incarceration and half a dozen parole suitability hearings violates due process because petitioner's commitment offense has been such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standards. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."

In a second such case, former Governor Davis had reversed a BPT suitability determination, stressing principally the gravity of the commitment offense. (Martuin v. Marshall, 431 F.Supp. 2d. at pp. 1040-1042), the court turned to the factors surrounding and preceding the offense, which included the 26-year-old petitioner fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of gunfire at a restaurant, wounding yet another bystander, and without seeking medical assistance for any of his victims. The court reasoned; "[Petitioner] has surpassed his minimum sentence, and has already been found suitable for parole by two decision-making bodies. [¶]...[T]he court finds that there was no evidence to support the Governor's reversal of petitioner's parole grant. As the [BPT] found, petitioner has not had a significant disciplinary violation since 1995. He has been in prison for approximately twenty-six years and has taken advantage of numerous rehabilitation and enrichment programs. He has exceeded his minimum sentence by approximately six

years." The court went on to state; "The Governor's sole reliance on 'the circumstances of the offense and conduct prior to the offense' [citation], constitutes a due process violation. The court finds no evidence to support any of the Governor's reason for denying parole, and therefore finds that the Superior Court's denial of [a] petition for habeas corpus was objectively unreasonable." (Id. at pp. 1047-1048.)

In Irons v. Warden of California State Prison-Solano, (E.D.Cal. 2005) 358 F.Supp. 2d. 936, the court stated; "[Important] in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole...."

The Petitioner in the herein cause has been incarcerated for 23 actual years. Second Degree Murder carries a maximum suggested base term of twenty-one years. (See CCR, Title 15, §2403(c).) With post-conviction credits available to Petitioner, another seven (7) years, eight (8) months, Petitioner has served a "Total Life Term" of thirty (30) years, Eight (8) months without committing another violent crime that would prove that Petitioner would more than likely pose an unreasonable risk of danger to society. The Board has illegally denied Petitioner parole suitability nine years and eight months past the Maximum Suggested Base Term.

**ARGUMENT II**

**THE BOARD OF PAROLE HEARINGS DENIED PETITIONER**

**DUE PROCESS AND EQUAL PROTECTION OF THE LAW BECAUSE IT HAS DENIED PAROLE SUITABILITY BASED ON FACTORS OF THE CRIME WHICH ARE "IMMUTABLE".**

While relying upon the nature of Petitioner's crime as an indicator of his dangerousness if released from prison may have been reasonable ten or fifteen years ago, but after more than twenty-three (23) years of incarceration and thirteen (13) parole suitability hearings violates due process because Petitioner's commitment offense has become such an unreasonable predictor of his present and future dangerousness and it does not satisfy the "some evidence" standards.

California courts have stated; "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the inmate will present an unreasonable public safety risk if released from prison Yet the predictive value of the commitment offense may be very questionable after a long period of time." (In re Scott, 133 Cal.App. 4th. at p. 595).

The length of actual time Petitioner has already served is well beyond the Matrix for Second Degree Murder Committed on or After November 8, 1978. The Board should not be allowed to change a sentence that is set by statute, that provides a sentence of 15 to 21 years and sentence Petitioner to a term of twenty-five (25) years to Life, or Life Without The Possibility Of Parole without evidence that Petitioner's release would pose a danger to society. (See Penal Code §3041 (b)).

The facts of the crime, or other unchanging factors can only effect Petitioner's parole suitability if he exhibit the same behavior he did when he committed the crime. Other wise, if the unchanged circumstances per se can be used to deny parole suitability, the Petitioner will never be suitable for parole because the circumstances of the crime will never change. So if one look at it from the Board members perspective, parole suitability could be indefinitely and forever delayed based on the nature of the offense.

In the PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS dated August 29, 2003, under **XIV. ASSESSMENT OF DANGEROUSNESS:** THE DOCTOR STATED:

> "**A.** This inmate has not received any further CDC-115 violations since the last report four years ago. Therefore, it is felt that he would pose a less than average risk for violence when compared to this Level II inmate population.
>
> **B.** If released to the community, his violence potential is estimated to be no higher than the average citizen in the community."

(See Exhibit "D", PAGE FOUR)

Penal Code §5068 requires the California Department of Corrections (now the Department of Corrections and Rehabilitation), to conduct and submit to the Board a psychological evaluation on persons appearing for parole consideration. The Board ask the CDC experts to specifically address the question of the prisoner's "dangerousness". The format agreed upon between the Board and CDC officials instructs the CDC experts to rate the prisoner's "DANGEROUSNESS" in terms of "violent potential". The CDC's Departmental Operations Manual (DOM) 62090.13 directs the

conclusion to be reported by the experts as either: "below average", "average" or "greater than average" violence potential. Once Petitioner has obtained a "below average violence potential" rating from a psychological evaluation, he has obtained the most favorable rating for release he can obtain. The Board panel members are not qualified professionals and for them to make contrary determinations of Petitioner's potential for violence or dangerousness reported by qualified psychologists, trained and hired by CDC to make such determinations and assessments, they are violating Petitioner's due process and equal protection of the law.

In short, the burden is not on Petitioner to prove that he is suitable, instead, the parole authority is only relieved of its obligation to set a release date if there is a legitimate concern that Petitioner would pose a threat of future violence if released. Such a decision must be based on Petitioner's violence potential and threat now, not what it was twenty-three (23) years ago.

The circumstances of Petitioner's crime do not amount to some evidence supporting the conclusion that Petitioner now poses an unreasonable risk of danger if released. "Some evidence", does not mean literally "any" evidence, and without evidence in the record that Petitioner's release would pose an unreasonable risk of danger to society **now**, the Board has no foundation for their decision that Petitioner is unsuitable for parole. Thus, the Board has violated Petitioner's constitutionally protected liberty

interest in being released on parole.

CONCLUSION

For the afore mentioned reasons, Petitioner respectfully request this Court grant review, or remand this case back to the appellate court to bring up to date the guidance provided in the cases mentioned herein, and to insure uniformity of decision making in the lower courts on issues frequently litigated, and to settle questions of law, so important that they impact directly upon the rights of all indeterminant sentenced prisoners.

Dated: January 21, 2007

Respectfully Submitted

Frank G. McCormick

Frank McCormick
(Petitioner)
In Pro Per

# EXHIBIT "A"




IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT




JAN 12 2007

MICHAEL J. YERLY, Clerk

By ________ DEPUTY

| | |
|---|---|
| In re FRANK MCCORMICK,<br><br>on Habeas Corpus. | H031028<br>(Monterey County<br>Super. Ct. No. HC5337) |

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J., participated in this decision.)

Dated JAN 12 2007 BAMATTRE-MANOUKIAN, J. Acting P.J.

# EXHIBIT "B"

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS

-219 L 3/9

LEGAL STATUS

| CDC NUMBER | ALPHA ID | NAME | TERM STARTS | ETHNIC |
|---|---|---|---|---|
| C-78307 | | MC Cormick, Frank Anthony | 12-22-83 | Black |

| MAX. RELEASE DATE | ~~MIN. RELEASE DATE~~ M.E.P.D. | MIN. ADJ. RELEASE DATE GT CR LOST/AT LARGE/BAIL | PAROLE PERIOD |
|---|---|---|---|
| To be determined | ~~12-03-94~~ 12-18-94 | ~~11-9-94~~ 5.14.93 5-16-93 | Life |

BASE TERM 15-00 + ENHANCEMENTS 02-00 = TOTAL TERM 17-Life

GOOD TIME CREDITS AVAILABLE (2931 PC) (PC ~~501~~ 194 BC ~~1503~~ ~~582~~ 581 ) = ~~2044~~ 2004

PRE PRISON CREDITS: CASE NO. MON MCR4898

| | |
|---|---|
| 2900.5 PC | 133 |
| 1202.03 PC | |
| 2900.1 PC | |
| CRC | |
| Mental Health | |
| 4019 PC | 67 |
| 2931 PC | |
| Post Sentence | 07 |

HEARINGS
~~Rx: 09/84~~
Doc: ~~12/87~~ Doc ~~12~~ 2/90
Init: ~~11/93~~ 11/93
4/92

Life Term starts 9.25.84

TOTAL PRE PRISON CREDITS (DAYS) 207

~~REGISTRATION~~ REQUIRED PER 290.2 3058.6

| DATE REC'D | CO. CASE NO. | CT. | CODE & OFFENSE | TYPE WPN. | DATE OF OFFENSE | SENTENCE DATE |
|---|---|---|---|---|---|---|
| CONTROLLING PRINCIPAL AND CONSECUTIVE (INCLUDING ENHANCEMENT) OFFENSE(S): | | | | | | |
| 12-22-83 | MON MCR4898 | 01 | P187 Murder 2nd (15-Life) P12022.5 W/Use of F'arm | Gun | 08-09-83 | 12-14-83 |
| NONCONTROLLING OFFENSE | | | | | | |
| 12-22-83 | MON MCR4898 | 02 | P245a ADW P12022.5 W/Use of F'arm | Gun | 08-09-83 | 12-14-83 |

DEFENSE ATTORNEY: JOHN HOWELL
INVESTIGATING AGENCY: SEASIDE POLICE DEPARTMENT

NAME MC CORMICK C-78307 LPU 05-14-84 LSC/slj

# EXHIBIT "C"

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

**PRESIDING COMMISSIONER PEREZ:** We have received all the information received from the public and relied on the following circumstances in concluding that you are not suitable for parole and that would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time. Sir, let me back up for just one moment and just let me know that we are going to deny you for one year.

**INMATE MCCORMICK:** Uh-huh.

**PRESIDING COMMISSIONER PEREZ:** The main factor, or one of the main factors, is the gravity of the offense, in that after reviewing the facts of this crime, it is the opinion of this Panel that the offense was carried out in a especially cruel and callous manner, in that the unarmed victim was shot at close range at torso piercing his aorta resulting in his almost immediate demise, and that according to the autopsy, he died within minutes of having been shot. In addition, sir, the motive for this crime was very trivial in relationship to the offense, in that it appears to have been

committed as a result of a argument between other individuals that really didn't involve you. Furthermore, sir, this particular crime created the potential for additional victims, in that there was another individual in the vehicle at the time of the offense. Sir, these conclusions are drawn from the statement of facts, wherein according to the record, the murder victim was killed in the parking lot of the Seasider Club on August 8th, 1983, at approximately 11:00 p.m. The cause of death was a gunshot wound to the heart. An investigation led police to information indicating that yourself and Alfred Johnson Jr. went to the Seasider parking lot. Johnson approached the passenger side of the auto occupied by Stephen Edwards and Alvin Brooks. McCormick approached the driver's side and a verbal dispute erupted between Johnson and Edwards. McCormick pulled out a handgun, which he pointed at Brooks. The dispute between Edwards and Johnson grew heated, a shot was fired and Edwards was struck when the bullet from the -- from McCormick's weapon. McCormick and Johnson fled the scene in an auto later traced to McCormick's residence. Furthermore, sir, the record does not reflect

that at the time of the offense that you did anything to aide this particular victim. The other factor that we looked at is denying you for one year, sir, is that at the time you committed the offense you were approximately 31 years of age and you had a very minimal criminal history, in that you only had, according to the rap sheet, a misdemeanor conviction for disturbing the peace. There is nothing in the record to substantiate that you've previously been convicted of gambling. Furthermore, we do note that at the time you committed the offense you were on active duty. Is that correct, sir? Active duty in the U.S. Army? We took into consideration as well the latest psychological report, sir, that is favorable. This particular report is authored by staff psychologist William Gamard, G-A-M-A-R-D, dated August 29th, 2003, in which the psychologist indicates that if released to the community he believes that your violence potential is estimated to be no higher than the average citizen in the community. In terms of your parole plans, sir, I do note for the record that you have very good parole plans. There is no requirement that you parole to your county of last legal residence, and quite

frankly, you can parole somewhere else and you think there is a better opportunity for you to do better in a different community, we certainly would encourage it. And we do note for the record that it is your plan to parole into a residential treatment program. We do have a letter verifying that, to the effect, in the Oakland area, and then it is your plan to live with your ex-wife in the Sacramento area after completing this six-month program. In addition, although there's not a specific job offer, we do note for the record that you have a number of marketable skills that you would be able to utilize upon your release to parole, specifically in the area of dry cleaning, small business machines, as well as a furniture assembler. Further, we do note for the record that you've provided to this Panel today, sir, information which indicates that you have been very active in trying to obtain information regarding employment resources that would assist you in obtaining employment upon your release to parole, and that's very commendable, sir. Sir, the other factor that we did take into consideration is the fact that between 1984 and 1998 you have incurred some 115s, and you've not

incurred any 115s since that time period. You did incur a 128 in 1999, but we don't weigh that in making our decision. We take into consideration the 115s and it is the opinion of this Panel, sir, that you must be able to demonstrate that you can go a longer period of time with no 115s before you can be found suitable for parole, in that from 1984 to 1998 you were incurring 115s. That's a 15-year period, and you've now gone six years without any 115s. Again, you must be able to demonstrate to the Panel that you can go an extended period of time without receiving any 115s, and that's the reason we gave you the one-year denial as opposed to a denial that's any longer than that. Furthermore, sir, we would like to commend you for not having received any 115s since 1998, and also for the Inmate Employability Program laudatory chrono that you received this year, as well as other laudatory chrono in your file, as well as for completing a variety of FEMA courses, and for your participation in AA. However, these positive aspects of your behavior do not outweigh your factors of unsuitability, and as a result we're going to deny you for one year. Sir, your most

psychological report is favorable. However, when you come before the Board the next time around, I would venture to say that if you continue doing what you've been doing, in terms of your program, you'll probably receive another favorable psychological report, so the Panel will have not only a recent one but a 2003 positive psychological report to consider during your next consideration hearing, so as a result, we're going to ask for another psychological evaluation. We're going to ask the psychologist to, again, determine your violence potential in the free community, as well as the significance of alcohol as it relates to your commitment offense and your ability to refrain from using that substance because, most likely than not, if you are found suitable for parole, what will happen is the Panel will probably give you a condition that you cannot use alcohol since you had been using alcohol at the time of the offense, and also to explore to what extent you've come to terms with the underlying cause of the commitment offense. Again, that will be an opportunity for you to make another favorable impression on another psychologist and have two psychological reports that are favorable when

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 71, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF FRANK MCCORMICK, CDC NO. C-78307, ON NOVEMBER 14, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated November 28, 2005, at Sacramento, California.

Stacy Wegner

STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

BOARD OF PRISON TERMS STATE OF CALIFORNIA
LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:
DENY PAROLE

[✓] PAROLE DENIED FOR: (1) 2 3 4 5 YEARS

Place the prisoner on the 11/2006 calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**

[ ] No more 115's or 128A's
[ ] Work to reduce custody level
[✓] Get self-help*
[✓] Stay discipline free
[ ] Learn a trade*
[✓] Get therapy*
[ ] Earn positive chronos
[ ] Get a GED*

[ ] Recommend transfer to ______
[ ] Other

* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

Name [signature] Date 11/14/05

Name [signature] Date

Name Date

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|
| McCormick, Frank | C78307 | | 11/14/05 |

BPT 1005(b)
(REV 04/04)

Distribution White-C File
Canary-BPT
Pink-Prisoner

# EXHIBIT "D"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
SEPTEMBER 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
AUGUST 29, 2003

This is the ninth psychological evaluation for the Board of Prison Terms on inmate Frank McCormick, CDC# C-78307. This report is a follow-up of the last psychological evaluation of 04/20/99. This report is the product of a personal interview, conducted on 08/29/03, as well as a review of his Central file and unit health record. This single contact interview was for the express purpose of preparing this report.

The inmate was informed of the nature and the purpose of the interview, and the lack of confidentiality inherent in the present assessment. He was also informed that a report for the Board of Prison Terms would be prepared. He understood this, and agreed to participate.

## PSYCHOSOCIAL ASSESSMENT

### I. IDENTIFYING INFORMATION:

Inmate McCormick is a 52-year-old, divorced, African-American male. As for religious affiliation, he said he goes to church sometimes (he went to a service two years ago; he has a Bible, which he reads sometimes; he prays sometimes).

### II. DEVELOPMENTAL HISTORY:

There is nothing new to add in this section.

### III. EDUCATIONAL HISTORY:

There is nothing new to add in this section.

### IV. FAMILY HISTORY:

Inmate McCormick's mother is still living, and resides in Sacramento. On one side of her apartment is the inmate's former wife (his second marriage), and on the other side of his mother's apartment lives his daughter of his former wife. He is regular contact with them, and states that his mother is coming to visit him soon. He reports that his grandmother died in July 2002. He said he has a total of four daughters and three sons from different marriages.

V. **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

There is nothing new to add in this section.

VI. **MARITAL HISTORY:**

Inmate McCormick states that he divorced his fourth wife in November 2001. The woman he has referred to as his "fiancée" (with whom he once tried to obtain family visits, but had lacked evidence of obtaining a divorce at the time) is his second wife.

VII. **MILITARY HISTORY:**

There is nothing new to add in this section.

VIII. **EMPLOYMENT/INCOME HISTORY:**

Since the last psychological report of four years ago, inmate McCormick has completed vocational dry cleaning. He had formerly been a captain's clerk, and has subsequently gone on to work in the PIA wood products area.

IX. **SUBSTANCE ABUSE HISTORY:**

Inmate McCormick acknowledges social drinking of alcohol, and smoking of marijuana at parties, but he denied ever abusing substances. He said he doesn't know why he was given a diagnosis of alcohol abuse in past reports. He said he continues to attend Narcotics Anonymous.

X. **PSYCHIATRIC AND MEDICAL HISTORY:**

Since the last report, inmate McCormick continues to take medication for diabetes and hypertension. In addition, he has arthritis, and medication for that, as well as allergic rhinitis and degenerative joint disease in his knees. More recently, he said that he had his kidneys tested due to the presence of blood in urine; he had a test last Tuesday.

XI. **PLANS IF GRANTED RELEASE:**

There is nothing new to add in this section, except that his mother now lives in Sacramento, and his grandmother has passed away, as stated above.

## CLINICAL ASSESSMENT

XII. **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate McCormick appears to be his stated age of 52. He was appropriately dressed and groomed. He was coherent, cooperative, calm, and alert throughout

the interview. His speech was clear and readily understandable. His flow of thought and affect were within the normal range. There were no hallucinations or delusions noted. He was fully oriented. His intellectual functioning was estimated to be within the average range. His attention and concentration were adequate for the purposes of this examination. There was no evidence of a mood or thought disorder. His insight and judgment appeared to be intact. He showed good insight into his commitment offense.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

**AXIS I:** No Contributory Clinical Disorder.
**AXIS II:** No Contributory Personality Disorder.
**AXIS III:**
1) Diabetes mellitus.
2) Hypertension.
3) Allergic rhinitis.
4) Arthritis.
5) Degenerative joint disease (knees).

**AXIS IV:** Incarceration.
**AXIS V:** GAF = 85.

Should this inmate at this time be given a parole or release date, his prognosis for maintaining his present gains in the community is excellent.

## XIII. REVIEW OF LIFE CRIME:

Asked his mistakes on the day of the commitment offense, inmate McCormick said, "Even being there. My wife tried to get me to go home, but I went down there with my friend, my crimee." Other mistakes were, "Having my gun with me. Even getting involved in the madness." Asked what illegal behaviors he did, he replied, "Carrying a gun," (which he stated was in his shoulder holster, and which he admitted was an illegal concealed weapon that he had carried for many, many years), and the other action was, "That I shot the man." He denied the truth of what a witness had said, that he had held his pistol to one of the victims' temple. He said that he and his partner were going to go fishing, but his partner had gotten into an argument with the victim who died a few days before. He saw the victim parked in the parking lot behind a bar. There were two other men in that car. He said that his partner "wanted to squash the whole thing." He explained that by this he meant that his partner wanted to forget the whole argument to have it resolved. "That's when they got into it." He said that the victim pulled a knife on his partner. His partner grabbed the victim's arm, and took the knife away from him. The inmate said about himself, "I went to the car, and told the other guy to get out so he wouldn't get involved in it, and stand back—because I used to go out with his sister, Duchess." He said the victim made a verbal threat by saying, "I'll blow both of you mother f-ckers away," and the inmate said, "And then he goes to reach under the seat. That's when I pulled my pistol. My intention was to hit the seat." When asked what he meant by this,

he said that it was his military training to first give a warning shot, but he didn't really have time to do that. He denied ever claiming in the past that he saw the victim's gun. He said, "I didn't see the gun. I don't know what he's got under the seat." He said that he had carried a pistol in a shoulder harness for many years, and had gotten into different types of arguments and scuffles, but had never felt he had just cause to use his pistol. He regrets getting involved in his friend's argument with the other man. He said that he regrets what he did. He takes responsibility for it, and said at the end of the interview, "I think about it every day; I think about how I could do it different." He claimed that the victim's gun was later found under the seat, but that the written report mentioning this was lost. He also said that his partner did not know he had a gun, and that his friend would have been killed if he hadn't acted: "You have to help your friends."

## XIV. ASSESSMENT OF DANGEROUSNESS:

A. This inmate has not received any further CDC-115 violations since the last report four years ago. Therefore, it is felt that he would pose a less than average risk for violence when compared to this Level II inmate population.

B. If released to the community, his violence potential is estimated to be no higher than the average citizen in the community.

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has generally done so during his incarceration period.

B. This inmate does not have a mental health disorder which would necessitate treatment, either during his incarceration period or following parole.

C. As this inmate denies having any drug or alcohol problem, no recommendations are made in this area, but the inmate is to be commended for continuing to go to NA meetings.

William Gamard, Ph.D

**WILLIAM GAMARD, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

WG/gmj

D: 08/29/03
T: 09/04/03

PROOF OF SERVICE BY MAIL
(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
)SS.
COUNTY OF MONTEREY )

I Frank McCormick, am a resident of the State of California, County of Monterey. I am over the age of 18 years and I am the party of the within action. My mailing address is P.O. Box 689, Soledad, California 93960-0689 On January 21, 2007 I served the foregoing:

**PETITION FOR REVIEW**

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States mail at Soledad, California, addressed as follows:

**California Supreme Court**
**350 McAllister Street**
**San Francisco CA 94102**

**Office of the Attorney General**
**455 Golden Gate Ave.**
**Suite 11000**
**San Francisco, CA 94102-7004**

There is regular delivery service by the U.S. Postal Service between the place of mailing and the places so address. I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 21 day of January, 2007, at Soledad, California.

/S/ Frank A. McCormick