IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK McCORMICK, ) | No. C 07-4246 JSW |
| ) | No. C 09-0826 JSW |
| Petitioner, ) | |
| ) | **ORDER DENYING PETITIONS FOR A** |
| vs. ) | **WRIT OF HABEAS CORPUS** |
| ) | |
| BEN CURRY, Warden, ) | |
| ) | |
| Respondent. ) | |
| ) | |

### INTRODUCTION

Petitioner, a prisoner of the State of California, currently incarcerated at the Correctional Training Facility at Soledad, filed this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Hearings ("BPH") denial of parole during parole suitability proceedings in 2005 and 2007. With regard to both petitions, this Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support of each.

After Respondent had answered, the United States District Court for the Ninth Circuit decided *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc), in which a number of important issues involving parole habeas cases had been raised. Consequently, the Court ordered the parties to provide supplemental briefs addressing the impact of *Hayward* on this case. Both parties filed supplemental briefs with regard to the 2005 BPH hearing. Respondent filed a supplemental brief with regard to the 2007 BPH hearing. For the reasons stated below, the petition is denied on the merits

## BACKGROUND

Petitioner was convicted of second degree murder with a firearm and assault with a deadly weapon in the Monterey County Superior Court on September 25, 1984. Petitioner was sentenced to 17 years-to-life in state prison for the second degree murder offense and the assault with a deadly weapon offense. Petitioner's minimum eligible parole date was May 14, 1993. In this habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges that his due process rights were violated by the denial of parole during his parole suitability hearings on November 14, 2005 and then again on September 4, 2007. As of the dates of the hearings, Petitioner had served 21 years and 23 years on his sentence, respectively.

**Commitment Offense**

The Board relied in part on the following account of Petitioner's commitment offense as set forth in an April 2005 counselor's report prepared by M. Rubio, Correctional Counselor I :

> The murder victim, Steven Edwards, was killed by McCormick in the parking lot of the Seasider Club on August 8, 1983, at approximately 11:00 p.m. The cause of death was a gunshot wound to the heart. Investigation led police to information indicating that Frank McCormick and Alfred Johnson, Jr., went to the Seasider parking lot. Johnson approached the passenger side of the auto occupied by Steven Edwards and Alvin Brooks. McCormick approached the driver's side. A verbal dispute erupted between Johnson and Edwards. McCormick pulled out a handgun which he pointed at Brooks. The dispute between Edwards and Johnson grew heated. A shot was fired and Edwards was struck with a bullet from McCormick's gun. McCormick and Johnson fled the scene in an auto later traced to McCormick's residence.

Respondent's Answer (07-4246), Exhibit 1, 2005 Subsequent Parole Consideration Hearing Transcript (hereinafter "07-4246, Ex. 1, 2005 HT") at 18-19; Respondent's Answer (09-0826), Exhibit 1, 2007 Subsequent Parole Consideration Hearing Transcript (hereinafter "09-0826 Ex. 1, 2007 HT") at 8-9.

**2005 Parole Proceedings**

At the 2005 parole hearing, Petitioner appeared with counsel before a BPH panel. The BPH relied on the description of the life crime in the correctional counselor's report, set forth above. At the hearing, Petitioner admitted that he committed the crime. "09-0826 Ex. 1, 2005 HT at 21." Regarding the circumstances of the crime, Petitioner testified that while with his friend Johnson in front of the Seasider Club, Johnson asked him to "watch his back" as he attempted to "squash" an argument he had with the victim that had started a few days earlier. *Id.* Petitioner testified that he watched Johnson and the victim argue next to a car in which the victim and Brooks were sitting and he'd seen Johnson take a knife away from the victim. *Id.* Petitioner testified that before he committed the murder, he'd gone over to the car and "I take Brooks out of the car, tell him to get out of the car, tell him to get out of the way." *Id.* Then, the victim had reached under his seat in the car and said "I'll blow both you MFs away." *Id.* Petitioner testified that he pointed at and shot the victim no more than four feet away and before doing so, he did not see a weapon on the victim. *Id.* at 23-25. Petitioner stated that he had no right to do what he did, but maintains that he shot the victim because he felt threatened. *Id.* at 24. Petitioner had been drinking just prior to the murder, but was not drunk at the time. *Id.* Petitioner was asked by the BPH if he ever apologized to the victim's family. *Id.* at 26. Petitioner responded that he talked to the victim's brother about the crime because he had been incarcerated at the same correctional facility as Petitioner and that he accepts "full responsibility" for the crime. *Id.*

Petitioner testified to having one prior conviction for disturbing the peace in 1973 because of a fight with a man during his birthday party. *Id.* at 30. Petitioner testified about his personal factors, including three marriages and subsequent divorces and his six biological and four adopted children. *Id.* at 31-34. Petitioner testified that he was in the military at the time of the life offense, and that his assignment was to artillery and special weapons. *Id.* at 35.

The BPH also considered Petitioner's parole plans, to live with his ex-wife after completing a residential program. *Id.* at 38. The Presiding Commissioner discussed with Petitioner a recent letter from another woman stating she is his fiancé and that Petitioner could come to live with her. However, Petitioner maintained in the hearing that this woman is no longer his fiancé, and that he did not know she wrote that before the hearing, but that she wrote that "because I was going back to Pat." *Id.* at 39. Petitioner testified that he planned to live in the Allied Fellowship Services six-month residential program to obtain vocational skills in forklift operation, to continue to abstain from alcohol, and to readjust to life outside prison. *Id.* at 40-44. After the program, Petitioner planned to live with his ex-wife, the mother of three of his six children. *Id.* Petitioner also expressed that he would like to start a dry cleaning business. *Id*.

The BPH considered Petitioner's post-conviction factors, including his conduct and achievements in prison. The Board considered Petitioner's disciplinary findings in prison, noting that he'd had quite a few '115s', but "sort of cleaned up your act in the late '90s." *Id.* at 55. Deputy Commissioner Nielsen noted that Petitioner's prior serious disciplinary findings included disobeying an order, threatening staff (which Petitioner stated was reduced to "disrespect toward staff"), another performance one, a failure to report, alteration of a document and one regarding grooming standards. *Id.* at 55-56.[1] During that period, Petitioner also received seven "128(a)" disciplines for the following: out of bounds, failure to complete a job assignment, unauthorized absence from work assignment, refused to report to work, failed to report to his job assignment, inmate grooming, and disrespect of staff. *Id.* at 56[2] Petitioner has remained discipline free since 1999. *Id*. at 61.

---

[1] Although Petitioner's disciplinary history is not outlined in any document in the 07-4246 record, Petitioner's disciplinary record is laid out in full in 09-0826, Ex. 1, 2007 Psychological Evaluation (hereinafter "09-0826, Ex. 1, 2007 PE") at 2).

[2] *See also* 09-0826 Ex. 1, 2007 PE, at 2.

4

The Board considered that Petitioner completed anger management programming between 1995 and 2005. *Id*. at 56.  Petitioner also participated in Narcotics Anonymous, completed a number of programs in 1995 and 1996, and served as president of the Men's Advisory Council in 1995. *Id.* at 56-57.  The Board discussed Petitioner's completion of vocational courses in dry cleaning, air resources, small engines, business administration, hand router training, sander and assembly, fire safety, power tools, typing, and FEMA Emergency Management as well as Petitioner's receiving a prison staff commendation in his furniture building job for "above average to exceptional" work. *Id.*  Petitioner also completed the Inmate Employability Program, a program that helps inmates with skills such as job searching, networking, and accessing community resources. *Id.* at 52. The BPH also considered Petitioner's most recent psychological at the time of the hearing, although the report was completed in 2003. *Id*. at 60.

After recessing to consider the evidence before it, the BPH found that Petitioner was not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. *Id*. at 65.  The Presiding Commissioner explained that, in deciding to deny parole, the panel considered all of the information before it and found that the crime was especially cruel and callous, as the unarmed victim was shot at close range at the victim's torso, piercing his aorta, and causing the victim's death within minutes of the shot and the motive was very trivial in relationship to the offense in that Petitioner committed the offense as a result of an argument that did not involve him. *Id.* at 66.  The Presiding Commissioner further noted that the circumstances of the crime, a close range shooting of an individual in a car parked outside a nightclub "created the potential for additional victims" and that Petitioner had also pointed a gun at Brooks, a fact Petitioner did not discuss or acknowledge at the hearing. *Id.*

In electing to deny Petitioner's parole for only one year, the BPH considered positive aspects of Petitioner's case, including petitioner's lack of a substantial pre-

5

commitment criminal history, a positive 2003 psychological evaluation, the fact that Petitioner was on active duty in the United States Army at the time of the crime and that Petitioner's parole plans to reside in a residential treatment program and then with his ex-wife were "very good." *Id*. The BPH also noted that Petitioner acquired marketable skills while in prison although Petitioner did not have a specific job lined up for when he is released. *Id*. Although the BPH commended Petitioner for remaining discipline free since 1999, the BPH specified that the unsuitability decision was based on the substantial number of "disciplinary 115s" Petitioner had incurred over a 15 year period from 1984 to 1998 and told him that "you must be able to demonstrate that you can go a longer period of time with no 115s before you can be found suitable for parole[.]" The panel specified that Petitioner must remain disciplinary free in order to establish that he is no longer a danger to the public. *Id*. at 69.

At the conclusion of the hearing, the Board requested a full psychological evaluation of Petitioner before his next BPH hearing, especially to ascertain his violence potential and his ability to refrain from alcohol upon release. *Id.* at 71. The BPH also recommended that Petitioner continue self-help and therapy programs. *Id.*

**State Court Proceedings**

Petitioner challenged the BPH's decision in the state superior, appellate and supreme courts. The Monterey County Superior Court issued the last reasoned opinion denying Petitioner's claims on October 6, 2006. 07-4246, Ex. 5, Monterey County Superior Court Order Denying Petition For A Writ Of Habeas Corpus, at 1-4. In the decision, the superior court judge found that the BPH's decision was supported by "some evidence" in the record that Petitioner was unsuitable for parole. *Id*. at 1. The court found some evidence to support the Board's finding that the commitment offense was carried out in an "especially cruel and callous manner" because petitioner shot the victim at close range, the victim was seated in a parked car with a dead battery, and the commitment offense had potential to harm multiple victims. *Id*. at 2. The court also

6

found support for the Board's finding that the motive was "very trivial" in relation to the offense. *Id.* The superior court found that the BPH did not base its decision solely on the commitment offense, but also on Petitioner's accumulation of seven disciplinary findings in a span of years, that led to its continued concern about Petitioner's ability to follow societal rules if paroled. *Id.* at 3.

The superior court found that the BPH's decision was also based on its concerns that prior psychological evaluations had not adequately assessed Petitioner's potential for violence. *Id.* The superior court noted that the Board's decision reflected its findings that more evidence was needed that Petitioner was willing to accept responsibility for the commitment offense, would continue to participate in self-help and therapy programs, remain discipline free and that his potential for violence and the role that alcohol plays in Petitioner's violence potential if released could be determined by a further psychological evaluation. *Id.* at 2-3. Petitioner's challenges in the Court of Appeal for the Sixth Appellate District and the California Supreme Court were denied without a reasoned decision. 07-4246, Exs. 6-7.

**2007 Parole Proceedings**

After reading the same description of the life crime contained in the counselor's report, the BPH discussed with Petitioner his version of the life crime. In addition to the facts he testified to at the 2005 hearing, Petitioner testified that prior to the murder, he saw Brooks "get into it" with Johnson and that he "pulled Brooks out of the car and told Brooks not to interfere with the argument." 09-0826, Ex. 1, 2007 HT, at 9. He further testified that Johnson had also been convicted of Second Degree Murder." *Id.* at 13.

The BPH considered Petitioner's behavior between the 2005 and 2007 hearings. It noted that Petitioner obtained self-help through Narcotics Anonymous, Alcoholics Anonymous, and participated in programs on How to Become a Sober Father and Not Get Angry as well as Alternatives to Violence. *Id*. at 29-32. Petitioner also incurred no further prison disciplinary findings. *Id*. at 29. The BPH noted that Petitioner received

his certification in forklift operation between the two hearings and received average to satisfactory ratings in his job performance as a furniture assembler between 2005 and 2007. *Id.* at 31.

The Board considered Petitioner's psychological evaluation conducted in March 2007. *Id.* (09-0826, Ex. 1, 2007 PE, at 1). The Board discussed with Petitioner that the psychological evaluation involved an assessment to assist in evaluating his potential for future violence in the community. *Id.* at 39. The Board noted that the psychological report found Petitioner's potential for violence fell within the moderate range, with a rating system of "very low, moderate, high and very high." *Id*. at 39-44. According to the report, Petitioner possessed some traits exhibited by someone with a psychopathic profile. *Id*.

The evaluation further noted that Petitioner's score reflected patterns of promiscuity, "proneness to boredom, [and] lack of realistic long term goals." *Id*. The psychologist also found that Petitioner exhibits "some lack of remorse or guilt" toward his commitment offense, "failure to accept responsibility" for his actions, and "some negative attitude and a lack of insight" into the commitment offense. *Id*. at 40-41 (citing 2009 Ex. 1, 2007 PE, at 6-8). The report noted the conflict between Petitioner's description of the crime as committed in self-defense and the official record of Petitioner's conviction of Second Degree Murder, that the victim did not have a gun, as well as witness accounts that Petitioner held a gun to the temple of the other witness.) *Id*. at 46. The report also documented that Petitioner "'demonstrated a more cerebral expression of remorse'" when speaking about how he hurt the victim's family by killing the victim. *Id*. (citing 09-0826, Ex. 1, 2007 PE, at 8).

The evaluation also noted that Petitioner has a "'dependence'" on alcohol that puts Petitioner at "increased risk for engaging in impulsive behavior that is violent in nature." *Id*. (citing 2009 Ex. 1, 2007 PE, at 8). The psychological report noted that after 24 years of incarceration, Petitioner may struggle with adjusting back in to the

8

community outside of prison. *Id*. at 42. The psychologist concluded that Petitioner possesses a "moderate likelihood" of committing a violent offense if released on parole assuming he abstains from alcohol. *Id*. at 44-45. (citing 2009 Ex. 1, 2007 PE, at 7).

The Board considered the opposition of the Monterey County District Attorney's office. *Id.* at 60. Deputy District Attorney Deborah Gullet opposed Petitioner's release based in part on Petitioner's account of the crime. *Id.* Gullet discussed that according to witness Brooks, Petitioner initially pointed the gun at his temple, before telling Brooks to move so Petitioner could get a "clear shot" at the murder victim. *Id*. at 61. The District Attorney's office opposed Petitioner's release based on his lack of sincere remorse, evinced by the changing version of events, the psychological evaluation that Petitioner poses a moderate risk of violence and Petitioner's unstable social history. *Id*. at 62.

After reviewing all the information in Petitioner's record, the BPH panel found that Petitioner is not suitable for parole because he would pose an unreasonable risk of danger to society or threat to public safety. *Id.* at 72. The BPH determined that the commitment offense was "cruel" and showed "callous disregard for human suffering" and posed a risk to multiple victims. *Id*. at 76-77. The BPH applauded Petitioner's vocational and self-help accomplishments. *Id*. However, in denying parole, the BPH relied on Petitioner's psychological evaluation, noting that Petitioner's Global Adult Functioning score was a concern. *Id*. at 73. The BPH also expressed concern that there are several varied accounts of the commitment offense that differ from Petitioner's account. *Id*. Petitioner received a one year denial and the BPH requested an addendum to the 2007 psychological evaluation to be completed in 2008 to clarify discrepancies regarding Petitioner's alcohol use, Petitioner's remorse, and Petitioner's account of the commitment offense. *Id*. at 75.

**State Court Proceedings**

Petitioner challenged the BPH's decision in the state superior, appellate and supreme courts. The Monterey County Superior Court was the last court to issue a

9

reasoned decision on August 5, 2008. 09-0826 Ex. 2. The court found that the BPH decision was based on "some evidence" of Petitioner's dangerous, including the circumstances of the commitment offense, the negative psychological evaluation in 2007, Petitioner's lack of insight into and remorse for the commitment offense, as evinced by his minimizing his responsibility, as well as a history of questionable relationships. *Id*. at 2-8. The superior court reasoned that although the BPH cited the "callous" nature of the commitment offense, the nature of the commitment offense was only one reason it found Petitioner unsuitable for parole. *Id*. at 7. The court found that the BPH decision of unsuitability was "amply supported by the record." Petitioner's challenges in the Court of Appeal for the Sixth Appellate District and the California Supreme Court were denied without a reasoned decision. 09-0826, Ex. 3; Ex. 6.

## DISCUSSION

A. <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under this deferential standard, federal habeas relief

will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See, e.g., Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. *See Hayward v. Marshall*, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

B.   Legal Claims and Analysis

Petitioner claims that the BPH's denial of parole in 2005 and 2007 violated his

11

right to due process because the decision was not supported by sufficient evidence.

1.  State Law Standards for Parole in California

California's parole scheme provides that the BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).

In making this determination, the BPH considers an expansive list of factors including: the prisoner's social history, the commitment offense and prior criminal history, his behavior before, during and after the crime and "any other information which bears on the prisoner's suitability for release." *See* Cal. Code Regs. tit. 15, § 2402(b) – (d). The regulations specifically include as factors tending to support unsuitability for parole: whether the commitment offense was committed in an especially heinous, atrocious or cruel manner; a prisoner's previous record of violence; an unstable social history; psychological factors; and institutional behavior. Cal. Code Regs. tit. 15, § 2402(c). The regulations specifically include as factors tending to support suitability for parole: no juvenile record; stable social history; signs of remorse; stress-related motivation for the crime; lack of criminal history; age; understanding and plans for the future; and institutional behavior. Cal. Code Regs. tit. 15, § 2402(d).

The California Supreme Court case of *In re Lawrence*, 44 Cal.4th 1181 (2008), clarified what California law requires the parole board to find in order to deny parole:

The board must find only that the prisoner is a current threat to public safety, not that some of the specific factors in the regulations have or have not been established. *Id.* at 1212. This means that the "some evidence" test is whether there is "some evidence" that the prisoner is a threat, not whether there is "some evidence" to support particular secondary findings of the parole board, for instance that the prisoner needs more time for rehabilitation. *Id.* California law states that "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." *In re Rosenkrantz*, 29 Cal. 4th 616, 682 (2002). However, where "that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." *Lawrence,* 44 Cal. 4th at 1191 (emphasis in original).

2.  Federal Habeas Relief on Parole Denial Claims

The U. S. Constitution's Due Process Clause does not itself provide state prisoners with a federal right to release on parole. *Hayward*, 603 F.3d at 561. The substantive law of a state might create a right to release on parole, however. *See id.* at 555, 559. Although *Hayward* purported not to reach the question whether a California's substantive law created a federally protected liberty interest, *see id.* at 562, later cases from the Ninth Circuit have said or assumed it does. *See Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . . By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, *Hayward* necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause."); *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In *Hayward*, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); *id.* ("we must examine the nature and scope of the federally

enforceable liberty interest created by California's 'some evidence' requirement"); *see also Pirtle v. California Board of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.' *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some evidence' of current dangerousness. *Hayward* [603 F.3d at 562-63.]") *Hayward*'s application and these later cases make it clear that in the Ninth Circuit there is federal habeas relief available under §2254 for California prisoners denied parole without sufficient evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)). That requirement was summarized in *Hayward* as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

*Hayward*, 603 F.3d at 562 (footnotes omitted) (quoting *Lawrence*, 44 Cal. 4th. at 1210, 1213-14); *see also Cooke*, 606 F.3d at 1214 (describing California's "some evidence" requirement).

When a federal court considers a habeas case directed to a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state

courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2) for whether the decision was "based on an unreasonable determination of the facts in light of the evidence." *Cooke*, 606 F.3d at 1216 (citing *Hayward*, 603 F.3d at 563).

### 3. Analysis of Petitioner's Claims

#### a. 2005 Claim

The BPH determined that Petitioner was unsuitable for parole because the crime was carried out in a cruel and callous manner, the motive for the crime was trivial in relation to the offense, a sufficient amount of time had not passed since Petitioner had accrued seven disciplinary "115's" and that further evidence of Petitioner's current violence potential, alcohol dependence, and remorse for the crime was needed. The BPH and the state courts did not unreasonably conclude that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society. *Hayward,* 603 F.3d at 562-63; *In Re Shaputis*, 44 Cal. 4th 1241, 1259-60 (2008) (upholding unsuitability determination for prisoner who, despite favorable programming and prison behavior, still had not gained insight into his domestic violence and murder of his wife). The state court's rejection of Petitioner's petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Petitioner therefore is not entitled to federal habeas relief.

#### b. 2007 Claim

In 2007, the BPH relied primarily on the assessment of Petitioner's potential for violence in the 2007 psychological evaluation, as well as factors related to Petitioner's life crime, in denying Petitioner's parole. Notably, in *Hayward*, the concurring judges asserted that where the petitioner's most recent psychological evaluation determined that he presented a "low to moderate risk" of danger, "the state court did not unreasonably determine that this evaluation, and the evaluation's assessment of [the petitioner's]

commitment offense and his violent history, are evidence that [the petitioner's] release would pose a possibly 'moderate' risk to public safety." 603 F.3d at 570-71 (Berzon, J.,concurring). This Court finds that the state court properly applied California's "some evidence" standard in reviewing the Board's decision and did not unreasonably determined the facts in light of the evidence presented. *See Hayward*, 603 F.3d at 563. Therefore, the state courts' denial of his federal due process claims was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to habeas relief on his petition.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Jurists of reason would not find debatable or wrong that the decision that the state court reasonably applied California's "some evidence" requirement in upholding the denial of parole, and reasonably determined the facts in light of the evidence presented. *See Hayward*, 603 F.3d at 562-63.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: September 30, 2010

JEFFREY S. WHITE
United States District Judge

16

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

FRANK MCCORMICK,

      Plaintiff,

  v.

BEN CURRY et al,

      Defendant.

Case Number: CV07-04246 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 30, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Frank McCormick
C78307
P.O. Box 689
Soledad, CA 93960-0689

Dated: September 30, 2010

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk